# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 508 | **DATE** | 10/23/2003 |
| **CASE TITLE** | | QBE Intl. Ins. Ltd vs. Clark, et al. | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 11/12/2003 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order and consistent with the minute order entered on September 30, 2003, the Court denies plaintiff's motion for summary judgment on Counts I and II (doc. #87-2), denies the plaintiff's motion for summary judgment on Count III ( doc. #87-1), and grants the defendants' motion for partial summary judgment on Count III (doc. #86).

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | OCT 2 4 2003 | 108 |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | | |
| mm | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

**DOCKETED**

OCT 2 4 2003

| | |
|---|---|
| QBE INTERNATIONAL INSURANCE LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 01 C 0508 |
| vs. | ) |
| | ) Magistrate Judge Schenkier |
| J. ANTHONY CLARK, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, QBE International Insurance Ltd. ("QBE"), filed this action against (1) J. Anthony Clark, in his capacity as the Director of Insurance of the State of Illinois and as the Liquidator of the Illinois Earth Care Workers' Compensation Trust (the "Liquidator"),[1] and (2) Charles A. Abbick, Oliver B. Fifer, and Jacqui Bradley, all of whom were trustees of the Earth Care Workers' Compensation Trust. In Count I of its second amended complaint, QBE asserts a claim under 215 ILCS 5/154 for recission of the Directors and Officers Insurance Policy ("the Policy") issued by QBE to Earth Care Trust and its Trustees, based on alleged misrepresentations and false warranties by Earth Care in its renewal application for the Policy (Sec. Am. Compl. ¶¶ 24-27). In Count II, QBE asserts a claim for common law misrepresentation in connection with the renewal application for the Policy, and seeks a declaratory judgment that the Policy issued to Earth Care is null and void and that QBE has no obligations or liability under the Policy other than to return the premium payment (Sec. Am. Compl. ¶¶ 28-30). In Count III, QBE seeks a declaration that the "insured v. insured" exclusion

---

[1] Pursuant to Fed. R.Civ.P. 25, on September 30, 2003, the Court granted the Liquidator's unopposed oral motion to substitute the current Director of the Illinois Department of Insurance, J. Anthony Clark, for the previous Director, Nathaniel Shapo, as a defendant in this case (doc. # 107).

108

in the Policy bars coverage of negligence and breach of fiduciary duty claims the Liquidator has asserted against Earth Care's former trustees in a state court lawsuit (the "underlying lawsuit").

The parties have filed various motions for summary judgment. QBE has sought summary judgment on Counts I and II, arguing that the undisputed material facts show that the policy is void or unenforceable (doc. # 87-2), a claim that the defendants assert is not ripe for summary judgment. QBE also has sought summary judgment on Count III, arguing that the undisputed material facts show that the insured v. insured exclusion applies (doc. # 87-1). The Liquidator (joined by Messrs. Abbick and Fifer) also have moved for summary judgment on Count III, arguing that the same undisputed material facts show that the insured v. insured exclusion does not apply (doc. # 86).

On September 30, 2003, the Court heard oral argument on the summary judgment motions relating to Count III. On that same date, the Court issued a minute order denying QBE's summary judgment motion directed to Counts I and II, granting the defendants' summary judgment motion on Count III, and denying QBE's summary judgment motion on Count III (doc. # 107).[2] This Memorandum Opinion and Order sets forth the Court's reasoning for those rulings.

## I.

The legal standards governing a motion for summary judgment are well-established. Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where the issues to be decided are purely legal, and the parties have filed cross-motions for summary judgment on that issue, the Court must resolve the legal issue and enter judgment "as a matter of

---

[2]On October 15, 2002, by consent of the parties (doc. ## 72-73) and pursuant to 28 U.S.C. § 636 (c), this case was assigned to this Court for all proceedings, including the entry of final judgment (doc. # 74).

law" for one side or the other. Where resolution of the legal issue ends the case, a final judgment is entered on cross motions under Rule 56(c) for the prevailing party.

With regard to factual issues, a genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909 (1988). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977 (1987), and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) To be material, a fact must be outcome determinative under the substantive law governing the motion. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A "genuine issue" exists when the party opposing the motion for summary judgment serves and files, pursuant to local Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (*e.g.*, affidavits, depositions, answers to interrogatories, admissions etc.). Fed. R.Civ.P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex,* 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone,

3

but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324; *Insolia*, 216 F.3d at 598.

## II.

We begin the analysis by reviewing the historical facts that the parties do not dispute.

### A.

QBE is a foreign corporation and a citizen of the United Kingdom (Pl.'s Rule 56.1(a)(3) St. ¶ 1). Illinois Workers' Compensation Trust Earth Care ("Earth Care" or "the Trust") was a self-insured workers' compensation pool authorized to transact business in the State of Illinois (*Id.* ¶ 2). Pursuant to a state court order dated October 26, 1999, Nathaniel S. Shapo, then the Director of Insurance of the State of Illinois, was appointed the Liquidator of Earth Care (*Id.* ¶¶ 3-4) – a position to which, as explained above (*see* note 1, *supra*), J. Anthony Clark has succeeded. Oliver Fifer was a Trustee of Earth Care and at all relevant times is a citizen of Illinois (*Id.* ¶ 5). Charles A. Abbick, Jr. was a Trustee of Earth Care and at all relevant times was a citizen of Kansas (*Id.* ¶ 6). Jacqui Bradley was also a Trustee of Earth Care and at all relevant times was a citizen of Illinois (*Id.* ¶ 7).

During the time periods relevant to this litigation, Stateside Underwriting Agency ("SUA") acted as QBE's agent for the underwriting of D&O policies in the United States, such as the one purchased by Earth Care. At all relevant times, SUA's offices were located in Chicago, Illinois (Pl.'s 56.1(a)(3) St. ¶ 8). At all relevant times, Chad Gaizutis was a Vice President at SUA and the manager of its Underwriting Department (*Id.* ¶ 9). David Kengott is an insurance broker employed by Professional Liability Brokers & Consultants ("PLB&C"), which acted as an agent for Earth Care to obtain D&O insurance for the Trust (*Id.* ¶ 12).

4

E.C. Fackler, Inc. was the third-party Administrator of Earth Care. Fackler's offices were located in Chicago, and its responsibilities included providing all accounting, underwriting and claims' handling functions for Earth Care. One of Fackler's duties as third-party administrator of Earth Care was to obtain D&O insurance coverage for the Trust and its Trustees (Pl.'s 56.1(a)(3) St. ¶ 10). Carl Link was in charge of the Accounting Department at Fackler (*Id.* ¶ 16), and Torquka Johnson was its Claims Manager (*Id.* ¶ 18). David Monteau was the Marketing and Underwriting Manager at Fackler, and was the Fackler employee having primary responsibility for obtaining D&O Insurance for the Trust and Trustees (*Id.* ¶¶ 17, 19).

In April 1998, Earth Care obtained a D&O policy from Executive Risk ("ER"), pursuant to an application filed on March 19, 1996 (*see* App. II to Pl.'s Rule 56.1(a)(3) St., Tab 33, at 57-60; Defs.' 56.1 Add'l. Facts ¶ 94). In that same month, QBE took over the policy from ER (Pl.'s Rule 56.1(a)(3) St., Tab 33, at 60-61). Thus, the application used to obtain the policy taken over by QBE in April 1998 was on an ER, and not a QBE, form (Defs.' 56.1 Add'l. Facts ¶ 93).

### B.

In early 1999, a Fackler employee (whose identity has not been disclosed in the summary judgment papers) filled out an application on a QBE form to renew the Trust's D&O policy (Pl.'s 56.1(a)(3) St. ¶27). Mr. Abbick signed the renewal application—without first reading it—on or about February 18, 1999 (*Id.*, ¶ 28). Question 4(a) of the renewal application asked "Have there been any changes in the Board of Directors or Senior Management of the Applicant within the past year for reasons other than death or retirement." The question was answered "No" (*Id.* ¶ 29).[3] That answer

---

[1]Both the 1998 application and the 1999 renewal application were designed to be used by for-profit corporations and not for trusts (Defs.' 56.1 Add'l Facts ¶ 98). Thus, Question 4(a) was the phrase "Board of Directors" instead of "Trustees" (*Id.* ¶ 103). The 1999 renewal application was never amended to use language more directly suited to a trust

was correct on the day that the application was dated, February 18, 1999 (Defs.' 56.1 Add'l Facts ¶ 104).[4]

### C.

On or about February 22, 1999, Fackler sent Kengott the completed renewal application for the renewal of Earth Care's D&O coverage from QBE (Pl.'s. 56.1(a)(3) St. ¶ 26). Kengott sent the renewal application to SUA on or about February 24, 1999 (*Id.* ¶ 31). SUA provided preliminary underwriting on D&O insurance policies issued by QBE (*Id.* ¶ 23). After the renewal application was sent to SUA, the parties agreed to extend the original policy to June 15, 1999 to allow Earth Care to provide QBE with Earth Care's audited financial statements (*Id.* ¶ 38).

The underwriting process included gathering relevant information, providing commentary on the applicant, and offering recommendations for the terms and conditions to be offered (Pl.'s 56.1(a)(3) St. ¶ 23). SUA ultimately issued the policies for QBE, after communications with QBE's London Broker, Coleman & Cullum, Ltd. (*Id.*), which will be described below. QBE relied on SUA to analyze the applicants for coverage and submit those which would be appropriate for QBE's consideration. QBE expected SUA to perform a screening function and use its own underwriting judgment when submitting applications for QBE's consideration. The final decision on whether to accept a D& O risk would be made by QBE (*Id.* ¶ 25, 24).

---

(*Id.* ¶ 100). SUA received a request to amend the 1998 policy to amend the definition of director to include a trustee (again, the summary judgment papers do not disclose who did so). Although SUA agreed to the request, the change was never made (*Id.* ¶ 102).

[4] A "yes" answer to the question of whether there has been a change in the Board of Directors would not have automatically lead to the declination of an application of a policy of insurance. A "yes" answer would have led SUA to ask more questions (*Id.* ¶ 105); the reason for a change in the Board of Directors was important to SUA (*Id.* ¶ 106).

QBE also expected that SUA would maintain complete underwriting files on all D&O policies issued on behalf of QBE (Pl.'s 56.1(a)(3) St. ¶ 25). Although QBE did not use any written underwriting guidelines in deciding whether to issue the renewal D&O policy in 1999, Mr. Gaizutis of SUA testified that the information continued in the renewal application and the Earth Care financial statements were used for underwriting D&O risks (Pl.'s Rule 56.1(a)(3) St., Tab 33, at 40-41). Every document that QBE relied on in underwriting the 1999 renewal policy is in the QBE underwriting file in London (Defs.' 56.1 Add'l Facts ¶ 128).

**D.**

The Renewal Application provided that:

> For the purpose of this renewal application, the undersigned authorized agent of the person(s) and entity(ies) proposed for this insurance declares that to the best of his/her knowledge and belief, after reasonable inquiry, the statements herein are true and complete. The underwriter is authorized to make any inquiry in connection with this renewal application. Accepting this renewal application does not bind the underwriter to complete the insurance.

> The information contained in and submitted with this renewal application is on file with the underwriter and along with the renewal application is considered physically attached to the policy and will become part of it. The underwriter will have relied upon this renewal application and attachments in issuing any policy. This renewal application will become a part of such policy if issued.

> If the information in this renewal application materially changes prior to the effective date of the policy, the applicant will notify the underwriter, who may modify or withdraw any quotation.

(Pl.'s 56.1(a)(3) St. ¶ 30). The provision of the renewal application requiring the Trust to advise the insurer of any changes in the information contained in the application is common in insurance applications of this type (*Id.* ¶ 33). Mr. Monteau of Fackler was familiar with the provision of the

renewal application that required the reporting of any material changes in the information contained in the application (*Id.* ¶ 32).

Mr. Monteau was the Fackler employee who had the responsibility to advise QBE of any changes to the information contained in the Renewal Application (Pl.'s 56.1(a)(3) St. ¶ 43). Two of Earth Care's Trustees (Messrs. Fifer and Abbick) left and/or resigned from the Trust after February 18, 1999. Mr. Fifer resigned from Earth Care Board of Trustees "some time between February 18, 1999 and April 1, 1999," because his company was no longer purchasing workers' compensation coverage from Earth Care (Pl.'s 56.1(a)(3) St. ¶ 39; Defs.' 56.1 Add'l Facts ¶ 107). Mr. Abbick, on the other hand, testified that he announced his decision to leave the Board of Trustees on April 29, 1999 and tendered a written resignation to the Board on July 19, 1999, because he only wanted to spend five years as a Trustee (Pl.'s 56.1(a)(3) St. ¶ 40; Defs.' 56.1 Add'l Facts ¶ 110). Mr. Abbick considered his departure a "retirement" (*Id.*). But, he also indicated in an interrogatory answer that one of the reasons for his resignation was a disagreement with Fackler over the handling of excess insurance for the Trust (App. I to Pl.'s Rule 56.1(a)(3) St., Tab 11, Int. Ans. 1).

Mr. Monteau did not disclose these changes to QBE (Pl.'s 56.15(a)(3) St. ¶ 43). However, Mr. Gaizutis cannot identify by name one company where SUA received an application on behalf of QBE where a change in the Board of Directors was disclosed (Defs.' 56.1 Add'l Facts ¶ 112). Mr. Gaizutis also cannot remember if SUA was ever involved in a situation where a change in the membership of a board of directors ever led to the declination of a renewal of a policy (*Id.* ¶ 113).

## E.

On or about March 31, 1999, Mr. Gaizutis received the Trust's statutory annual statements from Mr. Kengott, which showed a negative surplus. Mr. Gaizutis informed Mr. Kengott that he would also need a narrative report from Earth Care on its plans for funding future operations and building a positive surplus (Pl.'s 56.1(a)(3) St. ¶ 47). On or about April 1, 1999, Mr. Kengott advised Fackler that QBE was concerned about Earth Care's ongoing losses, and required an explanation of the Trust's ongoing financial viability (*Id.* ¶ 48).

On or about April 17, 1999, Mr. Link of Fackler advised Mr. Kengott that Earth Care members would be billed additional premium to eliminate the surplus deficit (Pl.'s 56.1(a)(3) St. ¶ 49). On or about April 19, 1999, Mr. Kengott provided Mr. Gaizutis with the Trust's amended annual statement which showed a negative surplus of $1.2 million, and advised Mr. Gaizutis of the Trust's plans to bill members additional premium to eliminate that negative surplus (*Id.* ¶ 50). The minutes of the Earth Care Board of Trustees' meeting of April 29, 1999 state that the board passed a resolution approving a special premium assessment for members insured in the 1994 and 1997 policy years (*Id.* ¶ 51).

On or about June 11, 1999, Mr. Kengott sent Mr. Gaizutis the Trust's audited financial statements for 1998, and requested QBE's renewal terms (Pl.'s 56.1(a)(3) St. ¶ 52). On or about June 14, 1999, Mr. Gaizutis sent the audited financials and the renewal application to QBE. At that time, Mr. Gaizutis noted that the Trust had lost approximately $1.5 million in 1998, and that it planned to assess its members additional premium. Mr. Gaizutis recommended that QBE triple the premium it would charge Earth Care and double Earth Care's deductible, in part because of the Trust's poor financial condition (*Id.* ¶ 53). QBE agreed with the renewal terms suggested in Mr.

Gaizutis' June 14, 1999 facsimile, and asked Mr. Gaizutis to find out why the Trust had lost so much money (*Id.* ¶ 54).

On or about June 14, 1999, Messrs. Gaizutis, Kengott and Monteau participated in a telephone conference call. At that time, Mr. Monteau provided an explanation for Earth Care's financial difficulties, as well as Earth Care's plans to raise additional funds by way of the special premium assessment of Trust members. At that time, Mr. Gaizutis was provided with a copy of the board resolution approving the special premium assessment, and a sample letter to one of the Trust members relating to the assessment (Pl.'s 56.1(a)(3) St. ¶ 55). Based upon the information supplied by Mr. Monteau during the conference call, and the receipt of the board resolution and sample letter relating to the special premium assessment, Mr. Gaizutis recommended less of a premium increase for the Trust's renewal of coverage (*Id.* ¶ 56).[5]

Mr. Gaizutis' amended recommendation regarding the premium to charge for the renewal of the D&O policy is referenced in Mr. Gaizutis' report to QBE's London broker, Mr. Cullum, dated June 14, 1999 (Pl.'s 56.1(a)(3) St. ¶ 57). This report also referred to the special premium assessment, and provided QBE with a copy of the board resolution and sample letter which had been provided to Mr. Gaizutis (*Id.*). The resolution purports to bear the signature of Leonard Binstock (*Id.* ¶ 58), who has testified that the signature looks like his, but that he does not recall signing the document (Defs.' 56.1(b)(3) Add'l Facts ¶ 127). Mr. Binstock was not a Trustee, even though

---

[5]QBE increased Earth Care's premium from $5,000 on the 1998 policy to $7,500 on the 1999 policy. The deductible on the policy was increased from $5,000 to $25,000 (Defs.' 56.1 Add'l Facts ¶ 120). The $7,500 premium was less than the $15,000 premium that Mr. Gaizutis originally had recommended for renewal of the coverage (Pl.'s 56.1(a)(3) St. ¶ 53).

Mr. Abbick asked him to be, because he was not qualified to hold the position (*i.e.*, he was not an owner, director or employee of a Trust participant) (Pl.'s 56.1(a)(3) St. ¶ 59).

<center>F.</center>

Following receipt of Mr. Gaizutis' report to Mr. Cullum, QBE directed that the premium charged for the renewal be set at $7,500 (an increase from the previous $5,000 premium), with a deductible of $25,000 (reflecting an increase from $5,000). QBE also asked to be informed about the Trust members response to the special premium assessment (Pl.'s 56.1(a)(3) St. ¶ 62). On or about June 15, 1999, Mr. Gaizutis sent QBE's proposed renewal terms to Mr. Kengott, and requested an update on the Trust members' response to the special premium assessment (*Id.* ¶ 63). On or about June 16, 1999, Mr. Kengott advised Fackler of the renewal proposal, and that QBE requested an update on the special premium assessment as a condition of the renewal (*Id.* ¶ 64).

On or about June 28, 1999, Mr. Kengott provided Earth Care's response to QBE's request for an update on the special premium assessment. The information Mr. Kengott provided in his June 28, 1999 facsimile to Mr. Gaizutis came from Mr. Monteau of Fackler (Pl.'s 56.1(a)(3) St. ¶ 65). In his facsimile, Mr. Kengott advised Mr. Gaizutis that Earth Care had received a "healthy" response to the special premium assessment letters, and that the Trust had conducted "personal meetings with various individual accounts and have succeeded in receiving full payments and/or premium payment schedules" (*Id.* ¶ 66). The facsimile from Mr. Kengott to Mr. Gaizutis stated that the efforts to collect the special premium assessment "is a work in process" (Pl.'s Rule 56.1(a)(3) St., Tab 29).

On or about June 29, 1999, Mr. Gaizutis advised Mr. Cullum by facsimile of the Trust's response to QBE's request for information regarding the special premium assessment, quoting directly from portions of Mr. Kengott's June 28, 1999 facsimile (Pl.'s 56.1(a)(3) St. ¶ 67).

<center>11</center>

Mr. Gaizutis did not forward to Mr. Cullum the June 28 facsimile he had received from Mr. Kengott, and that facsimile therefore was not seen by Cullum or QBE. Moreover, the June 28, 1999 facsimile from Mr. Kengott to Mr. Gaizutis is not contained in the QBE underwriting files for the Policy (Defs.' 56.1 Add'l Facts ¶ 129).

In his communication to Mr. Cullum, Mr. Gaizutis stated that he considered the Trust's response to QBE's inquiry concerning the special premium assessment to be very positive (Pl.'s 56.1(a)(3) St. ¶ 67; Defs.' 56.1(b)(3) Resp. ¶ 67). Mr. Gaizutis' facsimile to Mr. Cullum omitted the last line of Mr. Kengott's June 28, 1999 facsimile, which had stated to Gaizutis that gathering the trust members' responses to the special premium assessment was a "work in process" (*Id.*). On or about June 30, 1999, following receipt of the information that Mr. Gaizutis provided regarding the Trust members' responses to the special premium assessment (Pl.'s 56.1(a)(3) St. ¶ 68), QBE agreed to renew the policy on the amended terms recommended by SUA.

Although Mr. Monteau had told Mr. Kengott that the Trust members' responses to the special premium assessment was "healthy," the parties do not dispute that Ernie Fackler, the founder of Fackler testified in his deposition that he would not have characterized the Trust members' response to the special premium assessment as "healthy." Instead, Mr. Fackler would have described the Trust members' response to the assessment as "disappointing" (Pl.'s 56.1(a)(3) St. ¶ 70), even if it was also a "work in process" (Defs.' 56.1(b)(3) Resp. ¶ 70).

Mr. Link, who was in charge of Fackler's Accounting Department, testified that, unlike Mr. Monteau, he would not have characterized the Trust members' response at all, but would have simply indicated how much had been collected on the special premium assessment ($11,000 out of a $1.5 million) as of June 1999; and he testified that such an amount could not be characterized as

"healthy" (Pl.'s 56.1(a)(3) St. ¶ 72, Tab 37, at 157-60; Defs.' 56.1(b)(3) Resp. ¶ 72). Ms. Johnson of Fackler had contact with Trust members after the assessment letters were sent out, and the responses she was getting from members she spoke with concerning the assessment were negative, with some members expressing outrage concerning the assessment (Pl.'s 56.1(a)(3) St. ¶ 73). Messrs. Kengott and Gaizutis testified that had they known that the Trust members' responses were disappointing, unhealthy or not positive, or that personal meetings had not taken place where full payment or payment schedules were obtained, then they would not have made the representations that were made to QBE on this issue (Pl.'s 56.1(a)(3) St. ¶ 76-77).

<p style="text-align:center">**G.**</p>

The renewal policy at issue, identified as Policy No. SUA81110 ("the Policy"), had effective dates from June 15, 1999 to June 15, 2000 (Pl.'s 56.1(a)(3) St. ¶ 85 (citing Sec. Am. Compl., Ex. A, Tab 1). The Policy provided $1 million in coverage for Earth Care's trustees. The term "Application" is defined to mean:

   (1)     The application for this policy, a copy of which is attached hereto.

   (2)     The application(s), including any material submitted therewith, for all previous policies issued by underwriters providing continuous coverage until the inception date of the Policy together with any material submitted with the application for this Policy, all of which shall be retained on file and deemed attached hereto as if physically attached hereto.

(Pl.'s 56.1(a)(3) St. ¶ 86). The Policy SUA81110 specifically excludes from coverage

"Any Claim made against the Directors and Officers:

   F.     (1)     by or on behalf of the Company or any Affiliate;

           (3)     by any security holder of the Company whether directly or derivatively, except where such security holder bringing such claim is acting totally independent or, and totally without the solicitation of, or assistance of, or

<p style="text-align:center">13</p>

participation of, or intervention of, any of the Directors and Officers, or the Company or any Affiliate.

(*Id.* ¶ 87). The Policy also contains a warranty clause, which states as follows:

It is warranted that the particulars and statements contained in the Application are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy.

By acceptance of this Policy the Directors and Officers and the Company agree:

(1)     That the statements in the Application are their representations, that they shall be deemed material to the acceptance of the risk or the hazard assumed by the Underwriters under this Policy, and that this Policy is issued in reliance upon the truth of such representations;

(2)     That in the event the Application contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by Underwriters under this Policy, this Policy in its entirety shall be void and of no effect whatsoever; and

(3)     That this Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts of insurance with the company and each of the Directors and Officers.

(*Id.* ¶ 88).

### III.

We now turn to QBE's motion for summary judgment on Counts I and II, which seek to establish that the policy is void and/or unenforceable. There is no dispute that Illinois law applies. We will address the legal standards first, and then move to a discussion of the disputed fact issues that require denial of summary judgment.

"Illinois law permits an insurer to rescind an insurance policy if the insured's application for coverage contains a misrepresentation that was made with intent to deceive or that is material." *TIG Insurance Co. v. Reliable Research Co.*, 334 F.3d 630, 635 (7th Cir. 2003) (referencing 215 ILCS

5/154). "A misrepresentation is material if it 'affects either the acceptance of the risk or the hazard assumed by the company.'" *Id.* Illinois courts frame the materiality question in terms of whether "'reasonably careful and intelligent persons would regard the facts as stated to substantially increase the chances of the event insured against, so as to cause a rejection of the application.'" *Id.* (citing and quoting *Methodist Med. Ctr. v. American Med. Ctr. of Ill.*, 38 F.3d 316, 320 (7th Cir. 1994) and *Small v. Prudential Life Ins. Co.*, 617 N.E.2d 80, 83 (1993)). "Testimony from an insurer's underwriter may be used to establish the materiality of omitted information." *Id.*

There is a strong policy preference in Illinois to send materiality questions to the jury. *TIG*, 334 F.3d at 635. *See also Golden Rule Insurance Co. v. Schwartz*, 751 N.E.2d 123 (2001), *affirmed in part, vacated in part*, 786 N.E.2d 1010 (2003). And, where the parties to an insurance contract have included "knowledge and belief" language in their contract, the rule in Illinois is that such language avoids rigid application of the materiality statute set forth in 215 ILCS 5/154. In *Golden Rule*, the Illinois Supreme Court specifically held that even though Section 5/154 states that a material misrepresentation, "even if innocently made, can serve as the basis to void a policy," the inclusion of "knowledge or belief" language in a contract can establish a "lesser knowledge standard." 786 N.E.2d at 1016. The Illinois Supreme Court explained that "this lesser standard shifts the focus from the determination of truth to a determination of whether the applicant, based on what it knew, believed to be true." *Id.* At the same time, the *Golden Rule* Court held that "the presence of 'knowledge and belief' provision in a policy will not insulate an applicant's responses from all review," because "the twin qualifiers of knowledge and belief require that knowledge not defy belief . . . what the applicant in fact believed to be true is the determining factor in judging the

truth or falsity of his answer, but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based." *Id.* at 1017.

After *Golden Rule* and *TIG,* where an insurance policy involves a "knowledge and belief" clause, as does the Policy at issue here, the determination of whether a misrepresentation is material involves the following three steps: (1) determining whether misrepresentations were made; (2) if so, determining the applicant's knowledge *and* belief at the time the misrepresentations were made concerning their truth or falsity; and (3) if the applicant made a misrepresentation that he or she knew or believed to be a misrepresentation, was it material (*i.e.,* did it affect the insurer's acceptance of the risk, and would the insurer have issued the policy had it known the true facts). *Golden Rule*, 786 N.E.2d at 1017. QBE points to three alleged misrepresentations that it argues meet this standard, and warrant the relief it seeks in Counts I and II. We address each of those in turn.

### A.

QBE argues that Earth Care's answer to Question 4(a) of the renewal application – that there had been no changes to the Board of Directors within the past year – was a material misrepresentation, because when Messrs. Abbick and Fifer left the Board of Trustees (or announced their intention to do so) in or around April 1999 – prior to the June 15, 1999 effective date of the Policy – those departures were not reported to QBE (QBE Mem. at 4-5). QBE argues that this omission was material because "the fact that the Trust was not reporting changes in the Board of Trustees at the time of the renewal gave QBE a level of confidence in the Trust's plans to remedy its financial difficulties" (Pl.'s 56.1(a)(3) St. ¶ 80), and given the Trust's financial difficulties, the additional information that Trustees were resigning would have resulted in non-renewal of the Policy (*Id.* ¶ 81). In support of this argument, QBE relies on case law in Illinois that imposes upon the

insured party an ongoing "obligation imposed by law to notify the insurer of any changed condition materially affecting the risk during the pendency of the application for insurance." *Carroll v. Preferred Risk Ins. Co.*, 215 N.E.2d 801, 802 (Ill. 1996).

The defendants argue that the answer to Question 4(a) was always "technically true" (Defs.' Mem. at 6), because the question asks about a Board of *Directors*, not a Board of *Trustees* (Defs.' 56.1(b)(3) Resp. ¶ 42). And, since Earth Care never had a Board of Directors, the correct answer to this question was always "No" (*Id.*). Alternatively, assuming that the word Directors can be read to include Trustees, the defendants claim that Question 4(a) does not require identification of Trustees who retire, and Mr. Abbick's resignation could be considered a retirement (*Id.*). In addition, the defendants argue that QBE was on notice of Mr. Fifer's departure before the Policy issued because it received the April 29, 1999 Board Resolution, which revealed that Mr. Fifer was no longer on the Board of Trustees as of that time (*Id.*). The defendants argue that, at a minimum, this document triggered QBE's obligation to investigate because it provided "reasonable notice" of the change in the answer to Question 4(a) (Defs.' Mem. at 6); *see also, New England Mutual Life Ins. Co. v. Bank of Illinois*, 994 F. Supp. 970, 982 (N.D. Ill. 1998) (an insurer's duty to investigate is triggered when it has reasonable notice that an insurance application contains false answers). Finally, defendants contend that any change in the answer to Question 4(a) would not have been material to QBE's decision to renew the Policy, because there is no evidence that QBE considered the fact that the Board of Trustees had not changed to be significant to its decision to renew (Defs.' 56.1(b)(3) Resp. ¶¶ 80-81).

The Court finds that the renewal application contained a statement that was no longer correct by the time the Policy issued because, by that time, there had been a change in the Board of Trustees.

17

We reject the defendants' argument that Question 4(a) was inapplicable to the Trust's renewal application, because it asked for changes to "directors" and not "trustees." That argument is inconsistent with the fact that the answer QBE gave on the renewal application for Question 4(a) did not say that the question was inapplicable to a trust and thus need not be answered, but rather was an unqualified "no" — showing that the Trust understood that the question applied to it, even though its organizational form utilized "trustees" rather than "directors." While there may be a factual dispute concerning whether Mr. Abbick's departure need not have been disclosed because he retired (Defs.' 56.1 Add'l Facts ¶ 110), or should have been disclosed because he departed due to a disagreement with Fackler over the handling of excess insurance for the Trust (Pl.s' 56.1(a)(3) St. ¶ 41; Defs.' 56.1(b)(3) Resp. ¶ 41), there is no dispute that Mr. Fifer left for reasons other than death or retirement and that his departure should have been reported.

Moreover, we find that the applicant (Earth Care) could not have had a reasonable knowledge and belief that the answer to Question 4(a) on the renewal application remained correct after Mr. Fifer left his position as a Trustee of Earth Care. Because there is no contention that the misrepresentation was intentional, the remaining issue is whether Mr. Fifer's departure as a trustee was not disclosed, and if so, whether that rendered the original answer to Question 4(a) a *material* misrepresentation. On both of these questions, we find that there are genuine disputes of material fact that preclude summary judgment.

There is no dispute that QBE (through its authorized agent, Mr. Gaizutis) was provided with a Board resolution passed at the April 29, 1999 meeting, and signed by the persons whom Earth Care listed as trustees, and that this resolution did not list Mr. Fifer as a trustee. The question is whether that document constituted reasonable notice that the answer to Question 4(a) in the renewal

18

application, signed two months earlier, was incorrect in stating that there was no change in the composition of the trustees. The document did not expressly state that there had been a change in the composition of the trustees. Rather, that fact could have been discerned by comparing the April 29, 1999 document with another document already tendered to QBE – the Trust's 1998 Annual Statement, which listed the trustees as of that time. Comparing the two documents reveals that Mr. Fifer was listed as a trustee on the 1998 Annual Statement, but not on the April 29, 1999 Board Resolution. We think that the question of whether the April 29, 1999 resolution was sufficient to provide reasonable notice that there was a change in trustees, a change that rendered the answer to Question 4(a) incorrect (or too obscure to provide reasonable notice) is a question of fact to be resolved at trial rather than on summary judgment. See generally, *Rexroad v. City of Springfield*, No. 94374, 2003 WL 21983300, 207 Ill. 2d 33, _____ (Ill., Aug. 21, 2003) (whether certain facts constitute "adequate notice" is a question of fact); *Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 738 N.E. 2d 524, 539 (1st Dist. 2000) (reasonable time to give notice is a question of fact).

There are also fact questions concerning the materiality of a change in the composition of trustees to QBE's renewal decision. At the threshold, there is conflicting testimony by Mr. Gaizutis concerning the significance of Mr. Fifer's departure from Earth Care's Board of Trustees (Compare Defs.'56.1 Add'l Facts ¶¶ 107-08 and Pl.'s Reply to Defs.' 56.1(b)(3) St. ¶¶ 107-08). To the extent that QBE argues that the departure of both Messrs. Fifer and Abbick as trustees would have been material, even if the departure of only Mr. Fifer would not, there still remains a genuine dispute as to the reason for Mr. Abbick's departure – that is, whether it was a retirement (which would not have to be disclosed) or was for other reasons (which would have to be disclosed). And, there is evidence that arguably contradicts QBE's evidence concerning the significance of the change in trustees to the

renewal decision. The parties do not dispute that Mr. Gaizutis, QBE's insurance representative at SUA, "cannot identify by name one company where SUA received an application on behalf of QBE where a change in the Board of Directors was disclosed" (Defs.' 56.1 Add'l Facts ¶ 112). Nor can "[Mr.] Gaizutis . . . remember if SUA was ever involved in a situation where a change in a board of directors ever le[ ]d to the declination of a renewal of a policy" (*Id.* ¶ 113). For these reasons, the materiality of the changes in trustees to QBE's renewal decision cannot be resolved on summary judgment.[6]

## B.

QBE argues that the documents that Earth Care submitted with respect to the special premium assessment also contained material misrepresentations (QBE Mem. at 5-6). For example, the Board of Trustee's resolution approving the special premium assessment purportedly was signed by Mr. Binstock. But, Mr. Binstock cannot recall whether he ever signed the Resolution (Defs.' 56.1(b)(3) Add'l Facts ¶ 127), and, in any event, he should not have signed it because he was not a Trustee (Pl.'s 56.1(a)(3) St. ¶ 59). There is no dispute that, at the time the renewal application for the Policy was pending, QBE had expressed concern regarding the Trust's financial condition because the Trust was operating on a negative surplus. The Board Resolution contained a special

---

[6]We are aware that while Illinois expresses a strong preference for sending materiality questions to the jury, there are cases in which materiality can be resolved on summary judgment. For example, in *TIG*, the Seventh Circuit affirmed and granted summary judgment rescinding an errors and omission ("E&O") policy issued by TIG to Reliable, a title insurance and escrow issuing agent. In applying for E&O coverage, Reliable was asked to list every claim or suit that had been filed against it in the past ten years, and failed to list the entry of a permanent injunction enjoining from "preparing Deeds or other legal documents relating to the transfer of real estate . . . and that . . . Reliable Research, Inc. . . . cease and desist the unlawful practice of law." In finding that the materiality of that misstatement could be determined on summary judgment, the Seventh Circuit observed that "[a]ll undisclosed claims are not equal," and that it "borders on the surreal to think that the nondisclosure was immaterial." 334 F.3d at 637. The Seventh Circuit endorsed the reasoning of the district court that "a court order permanently enjoining a title company from the unauthorized practice of law would be a 'red flag' to any reasonably careful and intelligent underwriter of Title Escrow Professional Liability Insurance." *Id.* On the record submitted on summary judgment here, the same cannot be said for a change in the identity of trustees.

20

premium assessment that was designed to address the negative surplus problems. QBE argues that if it had known that Mr. Binstock was not a Trustee, and that his signature on the resolution may have been forged, QBE would not have placed the confidence it did place in the existence of the Board Resolution when renewing the policy (Pl.'s 56.1(a)(3) St. ¶¶ 59, 78, 82-83).

Conversely, the defendants argue that the issue of Mr. Binstock's signature is a non-starter for purposes of summary judgment because, even if Mr. Binstock's signature was forged and even though Mr. Binstock was not a Trustee, there is no evidence or argument that the Board Resolution was not still legally valid because it carried the signatures of the other Trustees. Thus, argue defendants, QBE's reliance on the Board Resolution is the material issue, not whether Binstock signed the document (Fifer's Mem. at 11, citing *Methodist Med. Ctr. of Illinois v. American Med. Sec. Inc.*, 38 F.3d 316, 320 (7th Cir. 1994) (misrepresentations over immaterial facts cannot justify recision)).

We have not been pointed to evidence that someone forged Mr. Binstock's signature, and the evidence is certainly susceptible of the interpretation that he signed the resolution but just does not recall doing so. In any event, there is a genuine dispute of material fact on the issue of whether QBE would have accepted the risk of underwriting the D&O policy it issued to Earth Care if it had known that the Board Resolution adopting the special premium assessment was signed by Mr. Binstock, who was not a Trustee (Pl.'s 56.1(a)(3) St. ¶¶ 59-61; Defs.' 56.1 Add'l Facts ¶ 127). Thus, we may not grant summary judgment based on this issue.

## C.

QBE argues that Mr. Kengott's facsimile of June 28, 1999, which responded to QBE's request for an update on the special premium assessment, contained material misrepresentations.

21

In particular, QBE points to the statements in the facsimile of the Trust members' responses to the special premium assessment was "healthy," and that the Trust had conducted personal meetings with members at which full payment or payment schedules had been obtained (QBE Mem. at 6).

However, there are genuine disputes of material fact as to whether the information in the facsimile was material to QBE's decision to renew. The facsimile from Mr. Kengott to Mr. Gaizutis stated:

> In response to your question regarding the contributions, the insured has had a healthy response to their call letters. During the last week, they have had personal meetings with various individual accounts and have succeeded in receiving full payments and/or premium payment schedules. In summation, this is a work in process.

(Pls' Rule 56.1(a)(3) St., Tab 29). There is testimony that QBE relied on the statement that the Trust members' responses to the special premium assessment were "healthy" in deciding to renew the Policy. For example, after receiving the Board Resolution authorizing the special premium assessment, among other things, Mr. Gaizutis recommended a smaller premium increase than first proposed to QBE (Pl.'s 56.1(a)(3) St. ¶ 56-57), and QBE agreed to change the Trust's renewal premium from $15,000 to $7500 (*Id.* ¶ 62).

On the other hand, the parties agree that QBE did not ask Earth Care the amounts collected on the special premium assessment as of June 1999 (Defs.' 56.1 Add'l Facts ¶ 130); nor did it ask Earth Care to indicate the specific percentage of the assessment collected in June 1999 (*Id.* ¶ 131). There is also evidence that the June 28, 1999 facsimile is not in QBE's underwriting file in London, even though QBE has stated that all documents relied on for renewal are in that file (*Id.* ¶¶ 128-29). And, the June 29, 1999 facsimile from Mr. Gaizutis to Mr. Cullum (Pl.'s Rule 56.1(a)(3) St., Tab 30) left out Mr. Kengott's statement that the collection process was "a work in process," and there

is disputed testimony about whether this last line would have been material to QBE's assumption of the risk. This evidence raises a question as to the true level of significance QBE attracted to the state of progress in the Trust collecting the special premium assessment.

The Court finds that genuine issues of material fact exist on this question that preclude summary judgment.[7]

## IV.

We now turn to the parties' cross-motions for summary judgment on Count III, which deal with the question of whether the insured v. insured exclusion in the Policy applies to the Liquidator's claims against the Trustees in the underlying lawsuit. We will begin with the additional undisputed facts material to those motions.

## A.

The Policy contained an insured vs. insured exclusion, which in relevant part reads as follows:

III.    EXCLUSIONS

Underwriters shall not be liable to make any payment for any Loss in connection with any Claim made against the Directors and Officers:

* * * *

F.    (1)    by or on behalf of the Company or any Affiliates;

* * * *

---

[7]QBE understandably makes much of the fact that other members of Fackler had opinions about the "health" of the trust members' response to the special premium assessment different than those expressed by Mr. Monteau (QBE Mem. at 6). However, it was Mr. Monteau who was responsible for the information provided to Mr. Kengott (Pl.'s 56.1(a)(3) St. ¶ 65). What other members of Fackler knew or believed at the time the information was provided to Kengott may be relevant to the credibility of Mr. Monteau's stated belief at the time, as well as its reasonableness. But, credibility questions must be resolved at trial and not on summary judgment.

<div style="margin-left: 2em;">

(3)      By any security holder of the Company, whether directly or derivatively except where such security holder bringing such Claim is acting totally independently or, and totally without the solicitation of, or assistance of, or participation of, or intervention of, any of the Directors and Officers, or the Company or any Affiliate.

</div>

(Defs.' Count III Rule 56.1(a)(3) St., ¶ 8).

On or about October 21, 1999, the Director of the Illinois Department of Insurance, then Mr. Shapo, was affirmed as the Rehabilitator of the Trust, by order entered in the Circuit Court of Cook County, Illinois (Defs.' Count III ¶ 9). On or about October 26, 2000, an order of liquidation was entered by the Circuit Court of Cook County, and Mr. Shapo (now succeeded by Mr. Clark) became Liquidator of the Trust (Defs.' Count III ¶ 10). Pursuant to 215 ILCS 5/191 of the Illinois Insurance Code ("the Code"), the Director "is authorized to both sue and defend on behalf of the Trust in his name as Liquidator of the Trust, or in the name of the Trust."

On November 30, 2000, the Liquidator filed a six-count complaint in the Circuit Court of Cook County, Illinois against, among others, the former trustees of Earth Care in an action captioned *Nathaniel S. Shapo, Director of Insurance of the State of Illinois, as Liquidator of Illinois Earth Care Workers' Compensation Trust v. Charles A. Abbick, et al.*, No. 00 CH 17226 (the "underlying lawsuit") (Defs.' Count III St. ¶ 11). The complaint states that the Liquidator brought the underlying suit in his capacity as "Liquidator of the Illinois Earth Care Trust on behalf of the Trust's creditors, members and policyholders . . . ," under 215 ILCS 5/193(3) (Sec. Am Compl., Ex. C., ¶ 1). The defendants named in the underlying suit were five former trustees (Mr. Abbick, Mr. Fifer, Ms. Bradley, J. Mark Harrison, and Michael Hillyer; Fackler, the Trust's third-party administrator; and Illinois Zephyr, Inc. (an insurance agent retained by Fackler to act as the "exclusive marketer" of the Trust) (Sec. Am. Compl. Ex. C, ¶¶ 4-6).

Counts I and II of the underlying lawsuit allege breaches of fiduciary duty and negligence by the Trustee defendants, both to the Trust and to the participants of the Trust (Sec. Am. Compl. Ex. C, at Counts I (¶¶ 39-41), II (¶¶ 44-46)). Counts III and IV allege breach of fiduciary duty and negligent misrepresentation by Fackler – again, both to the Trust and to the participants (*Id.* at Counts III (¶¶ 49-51) and IV ( ¶¶ 54-56)). Counts I through IV each assert damages to the Trust in excess of $6 million (*Id.*, ¶¶ 42, 47, 52, 57). The remaining two counts allege breach of fiduciary duty by Fackler solely to the Trust (*Id.*, Count V), and a constructive trust on monies allegedly received by Mr. Abbick and Illinois Zephyr in breach of Mr. Abbick's fiduciary duty to the Trust and its participants (*Id.*, Count VI (¶¶ 64-65)). Counts V and VI seek recovery of approximately $1.7 million (*Id.*, ¶¶ 62, 66).

On August 31, 2002, the state court overseeing the liquidation of the Trust authorized the Liquidator to enter into a settlement with Mr. Fifer, who was joined only on Counts I and II in the underlying lawsuit (Pl.'s Rule 56.1(b)(3)(B) St., Tab 1). It was contemplated that the settlement amount, $900,000.00, would be paid through proceeds of the Policy (*Id.*). The Liquidator informed the Court presiding over the underlying lawsuit that the Liquidator had not settled with other defendants, and he intended to prosecute the claims against them (*Id.*).

**B.**

The Liquidator's motion for summary judgment on Count III of the second amended complaint seeks to avoid the effect of the insured v. insured exclusion. The Liquidator argues that the Section 5/193(3) of the Code "authorizes the Liquidator to sue on behalf of Earth Care's creditors, members and policyholders, not simply on behalf of the Trust" and that "is exactly what the Liquidator has done in the [u]nderlying lawsuit" (Liquidator Mem. at 5). The Liquidator further

25

asserts that "numerous courts have held that the . . . Exclusion does not apply to claims asserted by a liquidator, receiver or the bankruptcy trustee of an insolvent institution" (*Id.*).

For its part, QBE argues that the claims by the Liquidator against Mr. Abbick, Mr. Fifer and Ms. Bradley in the underlying lawsuit are brought by the Liquidator standing in the shoes of the Trust, and thus are barred by both the plain language and the underlying purpose of the insured v. insured exclusion. The plain language of the exclusion states that QBE will not cover losses in connection with claims directly by the Trust (*i.e.*, "by the Company") against the Trustees, or losses in connection with claims by a third party against the Trustees on behalf of the Trust (*i.e.*, "on behalf of the Company"). The purpose underlying the exclusion is to prevent collusion, "such as suits in which a corporation sues its officers and directors in an effort to recoup the consequences of their business mistakes . . . , thus turning liability insurance into business-loss insurance . . . ." *Level 3 Communications, Inc. v. Federal Insurance Co.*, 168 F.3d 956, 958 (7th Cir. 1999). QBE contends that in this case, as in *Level 3*, the Liquidator's claims against the Trustees in the underlying lawsuit "are all in the nature of business mistakes which would not be covered claims if made by Earth Care itself, and should therefore not be covered simply because they have become vested with the Liquidator by operation of law" (QBE Mem. at 13).

QBE further argues that the Liquidator cannot escape the insured v. insured exclusion simply because he proceeds in his own name as the "Liquidator," rather than in the name of the Trust itself. Even if the Liquidator purports to proceed "on behalf of the Trust's creditors, members and policy holders, as provided by 215 ILCS 5/193(3)" that is, on behalf of the Trust participants – any recovery still goes to the Trust and is used by the Liquidator, pursuant to his statutory authority, to satisfy the obligations of the Trust as a whole (QBE Mem. at 14-15). In this way, QBE argues, any

26

interests and/or recovery the participants have in the claims alleged are derivative of those held directly by the Trust (*Id.* at 14).

The determination of the question raised by Count III turns in the first instance on an interpretation of the role of the Liquidator when acting pursuant to authority granted by Section 5/191 and 193. Does the statute mean that the Liquidator is some separate legal entity – an independent third-party   who always operates outside the identified role of Trust, as the Liquidator has argued? Or does the statute mean that the Liquidator always sues as "the Trust," as QBE argues? Or, does it mean that the Liquidator can wear the hats of the Trust or the Trust's creditors, participants etc.   or both   even in the same legal proceeding?

To date, no Illinois court has interpreted the statutory language in the context of an insured v. insured exclusion clause like the one here. This Court is therefore left without guidance from the Illinois state courts as to how to determine what role the Liquidator plays in this case for purposes of applying the exclusion clause at issue. In a case where a choice needed to be made between competing statutory interpretations, such as the ones posed to us by the parties in this case, that choice might pose a certification question for the state courts. *See, e.g., Lehman Bros. v. Schein,* 416 U.S. 386, 393 (1974) (state certification desirable but also discretionary means for federal court to ascertain undecided point of state law). But, here, the Court does not consider certification appropriate or necessary because, under any reasonable interpretation of the statute, the exclusion clause does not apply to bar coverage of the Liquidator's claims.

If we interpret the statute as the Liquidator most broadly suggests we read it – that the Liquidator is never the Trust, but is instead some separate, unique entity   then the exclusion clause would not apply in this case to bar coverage of the claims he asserted against the trustees in the

27

underlying lawsuit. This would be the easiest case, since the Liquidator's claims by definition would always fall outside the plain language of the exclusion clause: he would not be acting "by or on behalf of the company."[8]

If we interpret the statute as QBE reads it – that the Liquidator is the Trust for all purposes – then the exclusion clause on its face would apply to bar coverage here. However, we do not find

---

[8] The federal bankruptcy and regulatory (FDIC, FSLIC and RTC) cases cited by the parties provide some – but not conclusive – support for this interpretation. Analogies can be made to both lines of cases and the one here. The bankruptcy code and 215 ILCS § 5/191 and 193 share common purposes – the winding up of a company's business affairs and the consolidation of individual and corporate claims for that purpose (with the effect that individual claims no longer can proceed outside of the statute's purview). But, the bankruptcy code is explicit about who the bankruptcy trustee always represents (*i.e.*, the estate not merely the debtor), and the liquidation statute is not, as it separately states that the Liquidator may deal with property of the company (Section 5/193(1)) and may assert claims of creditors, members and shareholders of the company (Section 5/193(3)). *Cf.* 11 U.S.C. § 323(a). Unlike the case with bankruptcy code and the majority of case law interpreting it, we do not find that 215 ILCS § 5/191 and 193 provide express support for treating the liquidator with the same degree of independence enjoyed by a bankruptcy trustee. *See, e.g., County Seat Stores, Inc. v. National Union Fire Ins. Co.*, 280 B.R. 319, 325-26 (S.D.N.Y. 2002) ("Simply stated, a bankruptcy trustee charged with a statutory duty and endowed with special statutory powers, is an independent and disinterested entity, separate and distinct from the debtor, as well as the pre-petition company, and as such does not strictly "stand in the shoes" of the debtor"); *Gray v. Executive Risk Indemnity, Inc. (In re Molten Metal Technology, Inc.)*, 271 B.R. 711, 729-30 (Bankr.D.Mass. 2002) (finding that Trustee is not the legal equivalent of the Debtor because (1) both entities co-exist "side-by-side, having different powers and rights;" (2) the duty of the Trustee is to the estate, whereas the duty of the Debtor is to the company's stockholders; (3) the Trustee is not governed by the pre-petition company's officers and directors; and (4) the claims brought by the Trustee belong to the bankruptcy estate which is separate from the Debtor and as a beneficiary of those claims "the Debtor stands last in priority"); *Reiser v. Baudendistel (In Re Buckeye Countrymark, Inc.)*, 251 B.R. 835, 840 (Bankr. S.D. Ohio 2000) (finding a bankruptcy trustee is a separate legal entity from the debtor because it does not represent the Debtor nor owe it a fiduciary obligation); *but see Reliance Ins. Co. of Illinois v. Weis*, 148 B.R. 575 (E.D. Mo. 1992) (finding no legal distinction between the debtor corporation and its bankruptcy estate); *National Union Fire Insurance Co. of Pittsburgh v. Olympia Holding Corp.*, Case No. 1:94-cv-2081-GET (9/18/1995), *affirmed without opinion in National Union Fire v. Olympia Holding*, 148 F.3d 1070 (11th Cir. 1998) (holding "there is no significant legal distinction between the company and the Trustee for the bankruptcy estate").

Similarly, the regulatory cases are not entirely analogous because the Liquidator, although a statutory receiver and a state administrative agent, is not a regulatory agency in possession of his own claims as well as the claims of the insolvent entity. *See, e.g., Federal Deposit Ins. Co. v. Zaborac*, 773 F.Supp. 137, 143-44 (C.D. Ill. 1991) (holding that FDIC "does not strictly step into the shoes of the failed bank" because "under statute and regulations, FDIC (and formerly FSLIC) may bring suit not only as a successor to [the Debtor], and not only on behalf of itself as a creditor, but also on behalf of the creditors and shareholders of [Debtor], and as subrogee to rights of depositors against [Debtor]"), *affirmed in FDIC v. American Casualty Co. of Reading, Pa.*, 998 F.2d 404, 407 (explicitly refusing to rule on whether the insured versus insured exclusion clause does not preclude coverage because FDIC is pursuing the action on behalf of itself as the Manager of the FSLIC Resolution Fund and for the benefit of the Debtor's "depositors, other creditors, and shareholders"); *cf. Mt. Hawley Ins. Co. v. FSLIC*, 695 f. Supp. 469, 482 (C.D. Cal. 1987) (holding exclusionary clause does apply to FSLIC/Receiver because the receiver brought "an action against the insured directors . . . acting solely as receiver for the failed S&L, and not on its own behalf in its corporate capacity").

that interpretation to be a plausible one, because it focuses entirely on Section 5/193(1), which states that the Liquidator is authorized deal with the property, business, or affairs of the trust "in his name as director, or, if the Court shall so order, in the name of the company," without accounting for Section 5/193(3), which states that the Liquidator also may bring an action against directors or officers of a company, or against any other person with respect to that person's dealing with the company, "on behalf of the creditors, members, policyholders or shareholders of the company." Thus, Section 5/193(3) makes clear that, even if the Liquidator is considered to "stand in the shoes" of the Trust, under Section 5/193(1) the Liquidator does so with enhanced rights that, pre-liquidation, the Trust did not have – specifically, the right to bring claims that, in a pre-liquidation setting, would belong exclusively to persons or entities other than the Trust.

In this case, the complexity that arises is that the claims that the Liquidator asserts against the Trustees in Counts I, II and VI of the underlying lawsuit are of a dual nature. The Liquidator asserts that the conduct of the Trustees challenged in those counts violated their duties to the Trust: those claims could have been asserted by the Trust prior to liquidation, and if the Trust had asserted them, then those claims would have been barred from coverage under the insured v. insured exclusion. However, the Liquidator alleges that the same conduct challenged in those counts also violated the Trustees' duties to the participants of the Trust. The participants are separate and distinct from the Trust. *See, e.g., Bellis v. United States*, 417 U.S. 85, 93, 97-99 (1974) (collective entity is legally distinct from its individual partners); *United States v. Crum*, Nos. 00 C 446, 00 C 447, 2001 WL 616642 (N.D. Ind., April 17, 2001) (a trust is a separate legal entity from its participants). Prior to liquidation, the participants could have asserted those claims of breach against the Trustees, and those claims would not have been barred from coverage by the insured v. insured

29

exclusion. However, in a post-liquidation setting, the Liquidator has the exclusive right to bring claims on behalf of the participants. *See People Ex Rel. Bailor v. Bell Mutual Casualty Co.*, 298 N.E. 2d 167 (Ill. 1973) (individual claimants (*e.g.*, policyholders, creditors, etc.) can only intervene in liquidation proceedings for relief under the Illinois Insurance Code once a liquidator is appointed by the Court; individual claimants cannot bring suit in their own names or on behalf of a class for relief). Thus, applying the exclusion merely because the claims are brought by the Liquidator would result in excluding from coverage participant claims that, prior to liquidation, would have been covered.[9]

We conclude that the answer to whether the exclusion clause applies in this case must be found by looking at the nature of the claims that are being asserted, and applying the well-established principle that exclusion clauses are to be narrowly construed. The claims alleged by the Liquidator in Counts I, II and VI in the underlying suit belong to *both* the Trust *and* the Trust participants. By definition, the exclusion clause bars coverage for claims brought by or on behalf of the Trust. This means that the intent of the Insurer, QBE, was to exclude coverage for claims that belong to and can be asserted on behalf of the Trust. The problem with applying the exclusion clause and effectuating that intent here is that to do so would throw out the baby with the bath water – that is, it would bar coverage of claims belonging to the Trust at the price of excluding coverage for claims belonging to participants that were not intended to fall within the exclusion. That would have the effect of expanding the scope of the insured v. insured exclusion, and thus would contravene the well-settled

---

[9]We do not see this as a situation where any tension created by the Liquidator asserting the same conduct as a breach of duty to the Trust (which would be excluded) and the participants (which would not be excluded) can be resolved by allocating any ultimate loss between covered and uncovered claims. Unlike the situation in *Level 3 Communications, Inc.*, the parties here have not pointed us to any term of the insurance policy that sets forth a procedure for allocating between covered and uncovered claims; nor do the parties here explain how such an allocation could be done in this case.

30

principles of Illinois law that exclusion clauses must be narrowly construed. *See, e.g., Stone Container v. Hartford Steam Boiler Inspection & Ins. Co.*, 165 F.3d 1157, 1159-1160 (7th Cir. 1999) (holding, under Illinois law, that "the ambiguities in insurance contracts should be resolved in favor of the insured"); *Transamerica Ins. Co. v. South*, 975 F.2d 321, 328 (7th Cir. 1992) ("under Illinois law . . . where there is ambiguity in the insurance policy, all exclusions, conditions or provisions which tend to limit or defeat liability should be construed most favorably of the insured"). *See also Home Indemnity Co. v. Wil-Freds, Inc.*, 601 N.E.2d 281, 284 (Ill. 2d Dist. 1992) ("A determination concerning the applicability of an exclusionary clause is governed by the same liberal duty to defend standard); *American Standard Ins. Co. v. Allstate Ins. Co.*, 569 N.E.2d 162, 165 (Ill. 1st Dist. 1991); *International Mineral & Chemical Corp. v. Liberty Mutual Ins. Co.*, 522 N.E.2d 758, 764 (Ill. 1st Dist.1988) ("if the language of the policy is ambiguous or otherwise susceptible to more than one reasonable interpretation, it will be construed in favor of the insured . . . this doctrine is . . . particularly applicable to ambiguities in clauses purporting to take away coverage otherwise granted by the policy").[10]

We understand that QBE might argue that this result unfairly limits the scope of the exclusion, because it might allow coverage for claims brought by a liquidator that belong to a

---

[10]We note that in *Shapo v. Engle*, No. 98 C 7909, 1999 WL 528528 (N.D. Ill., July 13, 1999), Chief Judge Kocoras addressed, but did not interpret, 215 ILCS §§ 5/191 and 5/193 in the context of a RICO claim. The district court resolved the issue of whether the liquidator's claims fell within RICO by looking at how the complaint was drafted, rather than at the nature of the claims at issue. The court found that, in that case, the liquidator had chosen to proceed on behalf of the policy holders and creditors of the company in liquidation, by expressly identifying himself that way in the complaint. As a result, the liquidator's claims did not fall within the RICO statute. In *Gary v. Am. Casualty Co. of Reading, Pa.*, 753 F. Supp. 1547 (W.D. Okla. 1990), one of the cases that *QBE* argues should guide our determination (QBE Mem. at 14-15), the court looked to the nature of the claims and not merely the words used in the complaint to express them. In our case, either approach leads to the same result. Although we find the rationale of *Gary* helpful in this case, for the reasons expressed above we do not hold, as *Gary* did, that the exclusion clause in this case bars coverage.

company, and thus would give the company a windfall by allowing coverage for a claim that would have been excluded prior to liquidation. We do not consider that argument persuasive here.

*First*, QBE has not attempted to show that the Counts I, II and VI of the underlying suit fail to state viable claims of both the participants and the Trust. So long as the participants' claims are no less viable than those of the Trust, there is no expansion of coverage because the exclusion would not have applied to participants' claims in a pre-liquidation setting. That is particularly so here, where the damages sought by the Liquidator in the underlying lawsuit are the same for claims of breach to the Trust and the participants. And, to the extent there was a difference, that could be addressed through an allocation of damages rather than barring any coverage for participant claims.

During oral argument on the motion for summary judgment, QBE argued that only those claims that a participant actually filed prior to the date of the liquidation order should be carved out from the exclusion. Thus, QBE would make dispositive to the applicability of the exclusion the timing of when a participant's claim was first asserted: if asserted by the Liquidator prior to the liquidation order, it would not fall within the insured v. insured exclusion; if asserted by the Liquidator only after the liquidation order (because by that time the participant no longer could assert the claim), it would be barred. We find no textual support either in the code or in the insured v. insured exclusion for making the question of coverage turn on whether the participant's claim was asserted before or after the liquidation order. To the contrary, we believe that QBE's contention would give the insurer a windfall that it did not bargain for in negotiating the exclusion, by expanding the scope of the exclusion to embrace participant claims that, prior to a liquidation order, clearly would not have been excluded. To the extent that an insurer wishes to contract for an exclusion that would extend to any claim brought by a liquidator, whether belonging to a trust or to

32

its participants or creditors, an insurer would be free to negotiate for such an exclusion. But, QBE did not do so here.

QBE also argues that holding the exclusion clause inapplicable would expose it to the risk of collusion, the very risk that QBE sought to avoid with the insured v. insured exclusion. We disagree. The claims at issue are brought by a Liquidator who is winding up the affairs of the Trust, not by the Trust as an ongoing entity. There is no evidence that the Liquidator's motivation or rationale for bringing claims that belong to Trust participants is collusive in the ways that the *Level 3* case defined collusion. QBE points to the Liquidator's settlement with Mr. Fifer in the underlying lawsuit for $900,000.00 (slightly less than the $1 million limit on the Policy) which is to be paid – if at all – out of proceeds from the Policy and not by Mr. Fifer, himself. To the extent that QBE suggests that the settlement was collusive because there was no risk that Mr. Fifer would be held liable had he gone to trial or because the amount of the settlement was excessive, QBE has failed to offer evidence to support either suggestion. On that score, we note that the claims against Mr. Fifer and the other Trustees in Counts I and II of the underlying lawsuit assert more than $6 million in damages; there is nothing on its face that would suggest a $900,000.00 settlement with one of five Trustee defendants was improper. What's more, at oral argument, QBE indicated that it was made aware of this settlement and elected not to invoke its right under the Policy to refuse to consent to it (*see also* Liquidator's Reply to Pl.'s Rule 56.1(b)(3)(B) St., Tab 1).

QBE plainly did not believe that there was a significant risk of collusive suits by participants against Trustees, because it did not seek to exclude those types of claims from coverage. QBE has not explained to the Court's satisfaction why the risk of collusion nonetheless would exist when the Liquidator asserts those claims of the participants, when the participants    in a post-liquidation

33

setting — no longer may do so. Again, QBE was concerned about that risk, QBE could have addressed it by issuing a policy that expressly excludes claims brought by a trustee, receiver or liquidator. The Court declines to give QBE, by litigation, what it failed to obtain by contract.

## CONCLUSION

For the reasons stated above and consistent with the minute order entered on September 30, 2003, the Court denies plaintiff's motion for summary judgment on Counts I and II (doc. # 87-2), denies the plaintiff's motion for summary judgment on Count III (doc. #87-1), and grants the defendants' motion for partial summary judgment on Count III (doc. # 86).[11]

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: October 23, 2003

---

[11]This order extends to defendant Bradley, who did not expressly join in the defendants' motion for partial summary judgment.

34